UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------X

CHARLES MILORO,

**MEMORANDUM & ORDER**

Petitioner,

06-CV-5671(NGG)

-against-

DALE ARTUS,

Respondent.
--------------------------------------------------------------X

NICHOLAS G. GARAUFIS, United States District Judge.

Petitioner pro se Charles Miloro ("Petitioner") brings this Petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Docket Entry # 1.) Petitioner was tried in 2001 in New York State Supreme Court, Queens County on fifteen counts relating to the assault, rape and imprisonment of his wife during the period from October 2000 through April 2001. Acquitted of nine of the counts by a jury, Petitioner here challenges the judgment of conviction on counts of rape in the first degree, robbery in the second degree, assault in the second degree, grand larceny in the fourth degree, criminal possession of stolen property in the fifth degree, and criminal possession of a weapon in the fourth degree. For the reasons set forth below, the Petition is DENIED.

## I. FACTUAL BACKGROUND

Before Petitioner's trial, hearings were held to determine inter alia the proper scope of the People's impeachment of Petitioner, should he take the stand, as well as the People's use of prior bad acts of Petitioner in its direct case. Among the convictions the People wanted to question Petitioner about were a 1998 federal conviction for felony possession of 29 firearms and a 1988

conviction for coercion in the second degree, arising out of a scheme in which Petitioner, and M,[1] one of his ex-wives, conspired to extort money from a man by falsely accusing the man of raping M after M had sex with him. (Pretrial Tr. 7-11.)[2] The evidence of previous bad acts that the People wanted to use in its direct case included various threats involving prior violent conduct – including the shooting of two police officers – allegedly made to the victim. (Id. at 52.) The People also wished to call M to testify to incidents that she suffered at the hands of Petitioner similar to those complained of by the victim, including being forced to be tattooed, like the victim, on an intimate part of her body. (Id. at 47-49.)

After vigorous argument by Petitioner's counsel and the Assistant District Attorneys assigned to the case (id. at 14-16, 40-47), the court denied the People's application to call M but granted the People's application to introduce evidence of Petitioner's alleged statements to the victim, as relevant to the issue of whether the victim's conduct, including sex, was by forcible compulsion. (Id. at 56.) The court granted in part the People's request relating to impeachment of Petitioner, allowing the People to ask Petitioner whether he was ever convicted of a felony and whether or not he was convicted in 1998 of possession of a firearm, but excluding many other convictions, including a prior conviction for coercion. (Id. at 67-68.)

The key witness at Petitioner's trial was the victim.[3] In her testimony she outlined her relationship with Petitioner, including how he raped her, imprisoned her in his home for a period of months, assaulted her on two occasions (on November 6, 2000 and April 6, 2001), forced her

---

[1] To protect the privacy of Petitioner's ex-wives, they will be referred to as "M" and "the victim," respectively.

[2] This citation is to the second transcript in volume 1 of the state court record. (See Docket Entry # 35.)

[3] In the course of a first trial of Petitioner on the charges, a mistrial was declared. The People had called a police officer who testified that, before he arrested Petitioner, he was looking for Petitioner for a federal parole violation. (Id. at 83.) The court had previously ruled that, other than statements to the victim, evidence regarding Petitioner's parole status would not be permitted at trial. (See id. at 86.) Petitioner's counsel moved for a mistrial, which was granted. (Id. at 83-84, 86.)

to write him a check for four thousand dollars, and threatened to kill her and her two daughters. (Trial Transcript, vols. 2-3 (Docket Entries ## 36-37) ("Trial. Tr.") at 623-82.) In addition to the victim, the People presented Daisy Abreu and Audri Nunez, who testified to, among other things, seeing a man on their block in Corona, Queens beat the victim and take off in a car on April 6, 2001. (See id. at 394-461.) This testimony was followed by the testimony of Shena Holland, a bank manager who testified that the victim had closed out a bank account in the amount of four thousand dollars and had written a check to Petitioner on the same date. (Id. at 471-79.) Next, a series of police officers and doctors testified concerning the circumstances of Petitioner's arrest, the treatment of injuries to the victim, and a search of Petitioner's home. (Id. at 479-611.) The People also called an expert in the fields of domestic violence and Battered Women's Syndrome ("BWS") who testified generally about those topics. (Id. at 793-830.)

For the defense case, eight witnesses were called. The defense first called two witnesses to testify about how the victim had previously made threats unrelated to the allegations in the indictment—once against an insurance broker, and once against a friend and business associate of Petitioner. (Id. at 832-61.) The defense then called two witnesses, a jewelry store owner and an automobile service worker, who testified that they observed Petitioner and the victim as a happy and affectionate couple. (Id. at 861-905.) These witnesses were followed by Petitioner's landlord, brother-in-law, and son, as well as testimony by Petitioner himself. (Id. at 899-1051.) This testimony provided Petitioner's version of events and somewhat undermined the victim's credibility, by, for example, raising the possibility that she had made prior false accusations, that some of her statements were inconsistent with others, and that she had asked for money to drop the charges against Petitioner.

3

At the end of trial, the court instructed the jury that Counts 1 through 7 charged Petitioner with rape in the first degree for each month between October 2000 and April 2001, respectively (id. at 1148-49); Counts 8 and 9 charged Petitioner with robbery of the victim on April 6, 2001 (id. at 1149-1153); Counts 10 and 11 charged Petitioner with assault on November 6, 2000 and April 6, 2001, respectively (id. at 1155-58); Count 12 charged Petitioner with unlawful imprisonment from November 6, 2000 through April 6, 2001 (id. at 1158-60); Count 13 charged Petitioner with grand larceny of the victim's bank account on February 14, 2001 (id. at 1160-61); Count 14 charged Petitioner with criminal possession of stolen property on April 10, 2001 (id. at 1161-62); Count 15 charged Petitioner with criminal possession of an open knife on April 6, 2001 (id. at 1162-63). The jury unanimously found Petitioner guilty on Counts 1, 9, 11, 13, 14, and 15, but not guilty on Counts 2 through 8, 10, and 12. (See id. at 1185-90.)

On December 20, 2001, Petitioner was sentenced to a term of twenty-five years in prison for Count 1 (Rape in the First Degree) and to lesser terms of imprisonment for the other counts on which he was found guilty. (Sentencing Tr. 13-15.)[4]

## II.    STATE APPEAL AND THE INSTANT PETITION

Petitioner filed a timely appeal in the Appellate Division. His claims were that (1) the trial court improperly admitted Petitioner's statements to the victim concerning his prior bad acts and failed to provide a legally sufficient instruction to the jury regarding these statements. He also claimed that (2) his trial counsel was ineffective for (a) failing to request proper curative instructions and object to the court's instructions to the jury; (b) failing to request a less prejudicial presentation of his alleged statements to the victim; (c) failing to request redaction of the victim's medical records; (d) failing to object to one of the doctors, Dr. Seguritan, as an expert in the field of medicine; (e) failing to object to the scope of the testimony of the BWS

---

[4] This sentencing transcript appears at the end of volume 3 of the state court record. (See Docket Entry # 37.)

expert, and eliciting prejudicial testimony from her; (f) failing to object when the trial court limited his cross-examination of the victim; and (g) failing to object or ask for a curative instruction during the People's opening remarks. In addition, he claimed that (3) the trial court improperly halted defense counsel's cross-examination of the victim; (4) the trial court improperly allowed the People to impeach Petitioner with his prior bad acts; and (5) his Fourth Amendment rights were violated because the police officers lacked consent to search his apartment.

On October 24, 2005 the Appellate Division affirmed Petitioner's judgment of conviction. It discussed only Petitioner's Fourth Amendment claim, finding it without merit because Petitioner's wife, the victim, had consented to the search in question. Petitioner's remaining contentions, it found, were "either unpreserved for appellate review or without merit." People v. Miloro, 22 A.D.3d 768, 768-69 (N.Y. App. Div. 2d Dep't 2005). On January 18, 2006, Petitioner's counsel made an application to the Court of Appeals for leave to appeal the judgment of the Appellate Division. Petitioner's counsel sought leave to appeal only certain of his claims of ineffective assistance of counsel and his claim regarding the statements referring to his prior bad acts allegedly made to the victim. (Declaration in Opposition to Petition (Docket Entry # 29) ("Opp. Decl."), Ex. D.) The Court of Appeals denied Petitioner leave to appeal on May 9, 2006. People v. Miloro, 6 N.Y.3d 896 (2006).

The instant Petition, dated October 9, 2006 and filed on October 16, 2006, is timely, as it was filed within a year of August 7, 2006, when his judgment of conviction became final. See 28 U.S.C. § 2254(d); Williams v. Artuz, 237 F.3d 147, 150-51 (2d Cir. 2001); McKinney v. Artuz, 326 F.3d 87, 96 (2d Cir. 2003).

## III.   PETITIONER'S CLAIMS

In his Petition, Petitioner seeks habeas review of all the claims he made in his brief to the Appellate Division.   Section 2254(b)(1)(A) of Title 28 provides that an application for a writ of habeas corpus may not be granted until the petitioner "has exhausted the remedies available in the [state] courts."   To exhaust state remedies, a petitioner must fairly present his federal claims to the highest state court having jurisdiction over them.   See Rosa v. McCray, 396 F.3d 210, 217 (2d Cir. 2005).

In New York, to exhaust federal claims, a criminal defendant must appeal his conviction to the Appellate Division, and then must seek further review by applying to the Court of Appeals for a certificate granting leave to appeal.   Galdamez v. Keane, 394 F.3d 68, 74 (2d Cir. 2005).   If a defendant seeking review by the Court of Appeals submits a letter discussing only certain of the claims he raised before the Appellate Division, the remaining claims will be considered to have been abandoned and therefore procedurally defaulted to the extent that they may no longer be exhausted in state court.   Grey v. Hoke, 933 F.2d 117, 120-21 (2d Cir. 1991).   On the other hand, if a defendant seeking review by the Court of Appeals does not specify particular claims but merely attaches the briefs submitted to the Appellate Division, all the claims in those briefs are deemed to have been fairly presented to the Court of Appeals and thus exhausted.   Galdamez, 394 F.3d at 76.

In his application to the Court of Appeals, Petitioner specifically identified as "reviewable and leaveworthy" two grounds:   (1) the erroneous admission of Petitioner's alleged statements to the victim and (2) the ineffective assistance of trial counsel.   Petitioner did not identify the other claims raised before the Appellate Division.   (Opp. Decl., Ex. D.)   In his Petition, Petitioner reiterates that he presented five grounds to the Appellate Division, but only

two grounds to the Court of Appeals. (See Pet. 15-17.) Therefore, under Grey, the three grounds not before the Court of Appeals are procedurally defaulted. See Grey, 933 F.2d at 121. Because Petitioner has not shown cause and prejudice for the procedural default or that he is actually innocent, see Sweet v. Bennett, 353 F.3d 135, 141 (2d Cir. 2003), these claims may not be considered on the merits and must be dismissed. See Grey, 933 F.2d at 121. Because the two claims relating to the erroneous admission of his statements and the ineffective assistance of counsel are properly exhausted, the court goes on to consider these.

A.     The Admission of Petitioner's Statements to the Victim

As discussed above, the court allowed the People to elicit evidence of various statements made by Petitioner to the victim, including that Petitioner told her after he first raped her that he was on probation, that he had shot two police officers, and that he would not go back to jail for rape. (Trial Tr. 641, 642.) Petitioner asserts that the limiting instruction provided by the trial court relating to this evidence of prior bad acts denied him his right to a fair trial, in violation of the Due Process Clause of the Fourteenth Amendment.

Since this claim was denied on the merits by the state court, see Miloro, 22 A.D.3d at 769, Petitioner may only prevail if he can show that the Appellate Division's decision "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Under this standard, Petitioner's claim fails. First, the admission of Petitioner's statements was entirely proper under New York state law, because the statements tended to show that Petitioner intended to forcibly compel the victim to engage in sexual intercourse, which is a required element of the offense of Rape in the First Degree. See People v. Williams, 81 N.Y.2d 303, 316-17 (1993); People v. Wright, 288 A.D.2d 409 (N.Y. App. Div. 2d Dep't 2001) ("Although not

7

admissible to show a defendant's general criminal propensity, evidence of a defendant's past uncharged criminal behavior may be admitted if it is relevant to a material aspect of the People's direct case, or because of some recognized exception to the rule, such as motive, intent, mistake of fact, common scheme or plan, or the identity of the defendant[.]"). Moreover, the court explicitly stated that it was not allowing introduction of evidence for propensity purposes, but, rather, on the issue of intent to forcibly compel.[5] Moreover, the trial court gave a limiting instruction in which it directed the jury not to consider the statements allegedly made by Petitioner as proof that he "had a propensity or a predisposition to commit the crimes for which he's charged in this case." (Trial Tr. 1139.) The court's rulings and jury instructions relating to the evidence make clear that it was not offered to show propensity, but rather to illuminate the state of mind of Petitioner and the victim, and the trial record makes clear that Petitioner was not convicted because of a criminal propensity.

Putting aside the intended use of Petitioner's statements to the victim, even if their admission had been for the improper purpose of showing Petitioner's predisposition to commit the crimes charged, no habeas relief would be available to Petitioner. The Supreme Court has specifically declined to decide "whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime." Estelle v. McGuire, 502 U.S. 62, 75 n.5 (1991). Therefore, because the Supreme Court has not created any clearly established law on when use of prior crimes evidence can violate the Due

---

[5] See Pretrial Tr. 56 ("The court finds that to demonstrate that the defendant has a propensity to commit a particular crime would be so prejudicial to the defendant that he would not be able to obtain a fair trial in this case. However, with respect to the testimony of [the victim], as to her state of mind, the defendant's reflections to her about his past is certainly probative on the issue of forcible compulsion which is the element of rape that is charged here . . . ."); see also Trial Tr. 1067 ("It's being offered to demonstrate the state of mind of the complainant and to demonstrate or establish the intent of the defendant as—it's not a demonstration of the defendant's propensity to commit this crime[.]").

Process Clause, the denial of Petitioner's claim could not have resulted in a decision contrary to clearly established federal law.

B.    Ineffective Assistance of Counsel

Petitioner also argues that his trial counsel was ineffective for (a) failing to request proper curative instructions and object to the court's instructions to the jury; (b) failing to request a less prejudicial presentation of his alleged statements to the victim; (c) failing to request redaction of the victim's medical records; (d) failing to object to the use of Dr. Seguritan as an expert in the field of medicine; (e) failing to object to the scope of the testimony of the battered-women's syndrome expert, and eliciting prejudicial testimony from her; (f) failing to object when the trial court limited his cross-examination of the victim; and (g) failing to object or ask for a curative instruction during the People's opening remarks. In Petitioner's request for leave to appeal to the Court of Appeals, Petitioner only presented arguments that trial counsel was ineffective for failing to object to the Molineaux evidence and seek curative instructions, failing to seek redaction of the victim's medical records, and failing generally to be interested in defense of Petitioner at trial. (Opp. Decl., Ex. D.) Only those grounds, therefore, should be considered on the merits in this Petition.

Even were the court to consider all the grounds identified by Petitioner, however, the court would not conclude that constitutionally ineffective assistance has been shown. The standard for such ineffectiveness is articulated in Strickland v. Washington, 466 U.S. 668 (1984). "Under Strickland, a defendant must show that counsel's representation 'fell below an objective standard of reasonableness' determined according to 'prevailing professional norms' and that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Murden v. Artuz, 497 F.3d 178, 198 (2d Cir. 2007)

(quoting Strickland, 466 U.S. at 688, 694). Review of the transcript in this case makes clear that

Petitioner received more than adequate representation, and that the conduct of defense counsel

was not constitutionally deficient. Petitioner's defense counsel was successful in having many of

Petitioner's prior acts and crimes excluded from trial, except to the extent that Petitioner made

statements to the victim; defense counsel then partially succeeded in undermining the credibility

of the victim; this overall strategy resulted in acquittal on nine of the counts in the indictment,

including the serious unlawful imprisonment count and seven of the rape counts. Moreover,

although Petitioner claims that trial counsel failed to object and was generally indifferent, the

trial record reveals defense counsel's vigorous objections and advocacy throughout the trial.

Further, most of the instances of error imputed to defense counsel by Petitioner

misconstrue the record. For example, defense counsel did not fail to request curative instructions

to the jury or fail to request a less prejudicial presentation of his alleged statements to the victim.

(See, e.g., Trial Tr. 1067 (trial counsel requesting limiting instruction), 389 (court noting that

trial counsel had objected multiple times already relating to statements about Petitioner's past

conduct).) Moreover, defense counsel objected during the People's opening (see id. at 373-88),

and also objected to the use of an expert on BWS (see Pretrial Tr. 45-46). Moreover, defense

counsel had a clear cross-examination strategy relating to the BWS expert, questioning whether

her general conclusions were relevant to the specifics of Petitioner's case. (See Trial Tr. 813-

30.) And, Petitioner was acquitted of the unlawful imprisonment charge, on which this BWS

testimony was most probative.

Other instances identified by Petitioner as error, even if they were error, did not rise to

the level of prejudice. For example, even if defense counsel had failed to object to the expertise

of Dr. Seguritan[6]—who treated the victim relating to the November 2000 assault—Petitioner was

acquitted of the November 2000 assault. Moreover, although defense counsel failed to seek

broader redaction of the victim's medical records relating to the April 2001 assault, there was

ample other evidence relating to that assault, including testimony from two eyewitnesses.

Finally, trial counsel did not fail to object to the court's curtailment of his cross-examination of

the victim (see id. at 786), and in any event, that cross-examination spanned over a hundred

pages of transcript (see id. at 682-786).

In sum, there is no basis in the record to conclude that trial counsel's assistance was

constitutionally deficient. Accordingly, there has been no showing that the state court's decision

to deny Petitioner's ineffectiveness claim was contrary to or an unreasonable application of

clearly established federal law.

## IV.    CONCLUSION

For the foregoing reasons, the Petition is DENIED. As Petitioner has not made a

substantial showing of the denial of a constitutional right, no certificate of appealability shall

issue. The Clerk of Court is directed to close this case.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York          ÑICHOLAS G. GARAUFIS
April 18, 2009                      United States District Judge

---

[6] Trial counsel did object to Dr. Seguritan's designation as an expert in emergency medicine (see id. at 526), and the court noted that the doctor was licensed to practice medicine in three states (see id.).